[Cite as *State v. Ferguson*, 2018-Ohio-987.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee/ | : | C.A. CASE NO.   27325 |
| Cross-Appellant | : | |
| | : | T.C. NO. 15-CR-3245 |
| v. | : | |
| | : | (Criminal Appeal from |
| TIMOTHY FERGUSON | : |  Common Pleas Court) |
| | : | |
| Defendant-Appellant/ | : | |
| Cross-Appellee | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 16th day of March, 2018.

. . . . . . . . . .

ALICE B. PETERS, Atty. Reg. No. 0093945, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee/Cross-Appellant

ADAM J. ARNOLD, Atty. Reg. No. 0088791, 120 W. Second Street, Suite 1502, Dayton, Ohio 45402
        Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Timothy Ferguson was found guilty by a jury in the Montgomery County Court of Common Pleas of one count of rape and one count of kidnapping. At sentencing, the offenses were merged, and Ferguson was sentenced to seven years of incarceration. Ferguson appeals from his conviction, raising three assignments of error, which relate to whether he should have been evaluated for his competency and sanity and whether he was denied the effective assistance of counsel. The State cross-appeals, challenging the merger of the offenses at sentencing. For the following reasons, the judgment of the trial court will be affirmed.

### *Facts and Procedural History*

**{¶ 2}** On October 17, 2015, Ferguson met T.D. at the Regional Transit Authority hub in downtown Dayton. At the time, both were homeless. Ferguson told T.D. that he was planning to get a motel room and asked T.D. if she wanted to get some food and watch television. T.D. agreed. They picked up a pizza and went to a motel in Harrison Township, where they watched television for a few hours. T.D. also injected cocaine during this time, and Ferguson drank an alcoholic beverage or beverages.

**{¶ 3}** According to the State's evidence, T.D. became nervous about being at the motel with Ferguson when he began making sexual comments and references to other people being in the room. She asked to use Ferguson's phone and went into the bathroom, where she called her mother, shared her concerns about the situation, and asked for a ride; she asked her mother not to call the police because she (T.D.) had an outstanding warrant for her arrest.

**{¶ 4}** Ferguson came into the bathroom, took the phone, grabbed T.D.'s arm, and

threw her onto the bed. Ferguson pulled off T.D.'s pants and underwear and, while he was on top of her, he told her to take off her shirt and bra. When she resisted, he hit her on the head and told her to stop listening to the other people in the room, because they did not know what they were talking about. T.D. was screaming and told Ferguson to stop, and he hit her on the head a second time, causing her to "see stars"; he also forced her legs apart and put his mouth on her vagina. Ferguson pulled the pillow out from under T.D.'s head and told her that he would "smother [her] to death" if she did not stop screaming.

{¶ 5} After he threatened to kill her, T.D. stopped fighting. Ferguson accused her and "the other people in the room" of putting "something on him" to make him lose his erection. He forced T.D. to masturbate him with her hand "for quite a while." He then "flipped [her] over on the bed," held his hand to the back of her neck to keep her face and arms on the bed, and vaginally raped her.

{¶ 6} T.D. denied that she had ever agreed to have sex with Ferguson and stated that there had never been anyone else in the motel room with them.

{¶ 7} When the rape ended, Ferguson went into the bathroom and T.D. fled from the room, naked, screaming, and without any of her belongings. She obtained help and clothing from a motel employee, who testified that T.D. was shaking, crying, and hysterical. T.D. called her mother again, and the mother told her that the police were already on their way.

{¶ 8} While they waited for the sheriff's deputies to arrive, T.D., the hotel employee, and another motel resident saw Ferguson walking away from the motel with a black backpack. After deputies arrived, T.D. was taken to a hospital, and the deputies

searched the vicinity of the motel for a man matching Ferguson's description. They saw Ferguson a few hours later less than two miles from the motel; Ferguson fled as soon as he saw the deputy, but his backpack was recovered. Ferguson had provided his name and identification when he rented the motel room. Ferguson was arrested in La Mesa, California, more than six months later.

{¶ 9} T.D. and a motel employee testified that there were sheets and a comforter on the bed when Ferguson and T.D. entered. This bedding was not in the room when the sheriff's deputies arrived.

{¶ 10} On July 18, 2016, Ferguson was indicted on one count of rape by force or threat of force, two counts of gross sexual imposition by force, and one count of kidnapping. The rape and kidnapping were felonies of the first degree, and the gross sexual impositions were felonies of the fourth degree. Ferguson stood mute at his arraignment, and a plea of not guilty was entered on his behalf. He did not request a mental health evaluation of any kind before trial, and he did not amend his plea to not guilty by reason of insanity. The matter was tried to a jury on October 12-14, 2016. Ferguson was found guilty of rape and kidnapping, but not guilty of both counts of gross sexual imposition.

{¶ 11} The trial court ordered a presentence investigation (PSI), and Ferguson was sentenced on November 2, 2016. The trial court found that the kidnapping merged with the rape as an allied offense of similar import. The State objected to the merger, but requested that Ferguson be sentenced on the rape. The trial court imposed a seven-year mandatory sentence for the rape and designated Ferguson as a Tier III sex offender.

{¶ 12} Ferguson appeals, raising three assignments of error. The State cross-

appeals, raising one assignment of error.

### *Ineffective Assistance of Counsel Regarding the Need for Mental Evaluation*

{¶ 13}   In his first assignment of error, Ferguson argues that he was denied the effective assistance of counsel because his attorney did not request a mistrial or a new trial when "[it] was made overwhelmingly apparent during the trial that [Ferguson] was hearing voices and imagining that other people were in the hotel room with him and [T.D.]" during the alleged rape.   In his second and third assignments of error, Ferguson asserts that the trial court abused its discretion or committed plain error in failing to order an evaluation of his competency on its own initiative.

{¶ 14}   The State responds that, although there was some evidence that Ferguson suffered from a mental illness, there was no evidence that counsel had failed to consider this issue, that Ferguson was denied the effective assistance of counsel, or that Ferguson had a condition that would satisfy the legal definition of incompetency or insanity. Because the evidence related to these assignments is the same, we will address these arguments together.

{¶ 15}   We review alleged instances of ineffective assistance of trial counsel under the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).   Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688.

{¶ 16} To   establish   ineffective   assistance   of   counsel,   a   defendant   must demonstrate   both   that   trial   counsel's   conduct   fell   below   an   objective   standard   of

reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See id.*; *Bradley* at 142. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992), citing *Strickland*; *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.).

### *Competency Standard*

{¶ 17} A defendant is incompetent to stand trial if he or she "is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense * * *." R.C. 2945.37(G). Criminal defendants are rebuttably presumed to be competent to stand trial. *Id.*

{¶ 18} The test for determining whether a defendant is competent to stand trial is whether he or she has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and whether the defendant has a rational and factual understanding of the proceedings against him or her. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 32, citing *State v. Berry,* 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995) and *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). In determining if incompetence was established, courts should consider the following: "(1) doubts expressed by counsel as to the defendant's competence; (2) evidence of irrational behavior; (3) the defendant's demeanor at trial; and (4) prior medical opinion relating to competence to stand trial." *State v. Rubenstein,* 40 Ohio App.3d 57, 60-61, 531 N.E.2d 732 (8th Dist.1987).

{¶ 19} It is well established that a defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and assisting his counsel; incompetency must not be equated with mere mental illness or emotional instability. *State v. Bock,* 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986); *State v. Fahl,* 2d Dist. Clark No. 2005-CA-98, 2006-Ohio-1809, ¶ 8. *Accord State v. Smith,* 89 Ohio St.3d 323, 329, 731 N.E.2d 645 (2000).

{¶ 20} Because a defendant is presumed to be competent to stand trial, the burden is on the defendant to prove by a preponderance of the evidence that he is not competent. *State v. Jordan,* 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28; R.C. 2945.37(G). A trial court's finding that a defendant is competent to stand trial will not be disturbed on appeal when there is some reliable and credible evidence supporting that finding. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 46.

### *Insanity Standard*

{¶ 21} A person is not guilty by reason of insanity only if he or she proves that, at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts. R.C. 2901.01(A)(14). A criminal defendant's sanity is not an element of an offense that the prosecution must prove. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. Rather, a plea of not guilty by reason of insanity is an affirmative defense, which must be pled and proved by a preponderance of the evidence. R.C. 2901.05(A); *State v. Brown,* 5 Ohio St.3d 133, 134, 449 N.E.2d 449 (1983).

### *Evidence in the Record Regarding Ferguson's Mental Health*

{¶ 22} At trial, T.D. testified that Ferguson made reference to "other people in the

room" three times: once immediately before the sexual assault began and twice during the assault. The first time, Ferguson told T.D. that there were other people in the room and that she "shouldn't listen to them." Then, after he had partially undressed T.D. and ordered her to take the rest of her clothes off, he hit her in the head and told her to stop listening to the other people in the room, "they don't know what they're talking about." Finally, Ferguson accused T.D. and others in the room of "put[ting] something on him" to make him lose his erection.

{¶ 23} There is no evidence in the record that Ferguson acted strangely during trial, was unable to understand the proceedings, or was unable to assist in his defense.

{¶ 24} The PSI contained varied and somewhat contradictory statements about Ferguson's mental health history. The PSI stated that, in April 2009, while on community control, Ferguson was referred to Eastway Behavioral Healthcare Center, but that he "refused to take any type of psychotropic medications, which may have contributed to his delusional thinking." Other than mentioning the symptom of "delusional thinking," the PSI did not state any specific diagnosis at that time. In April 2014, while on post-release control, the parole officer stated that Ferguson was "non-compliant," but did not specifically indicate any mental health concerns.

{¶ 25} In August 2014, Ferguson was placed on community control. During this period of supervision, the probation officer worked with Ferguson on "treatment" and "housing." The probation officer contacted "VOA, but they would not take Mr. Ferguson without mental health treatment being initiated." Ferguson failed to follow through with a referral to Eastway "by refusing treatment after being assessed"; in the next sentence, the PSI states that Ferguson was sent "for outpatient Sex Offender treatment." Before

that treatment began, Ferguson committed the offenses that are the subject of this case.

{¶ 26} The Social History section of the PSI,[1] under Physical/Mental Health, states that Ferguson reported that he had "never been diagnosed with a mental health disability" and was not under a doctor's care. The PSI did note that, in 2008, Ferguson pled not guilty by reason of insanity and received a competency evaluation. (The charge in that case was receiving stolen property.) "Results of the evaluation indicate Mr. Ferguson suffered from schizophrenia and often had paranoid and delusional thinking, but he repeatedly refused to take psychotropic medications." He was referred for treatment at Eastway, but failed to comply. However, in August 2014, Ferguson was screened by Samaritan Behavioral Health, Inc.; at that time, he "did not appear to be suffering from a mental disability" and was not referred for additional services.

{¶ 27} Although the references in the record to Ferguson's hearing voices and to past assessments and treatment raise questions about whether he had a mental disorder and, if so, what type, no reasonable inference can be drawn from this evidence that Ferguson lacked the ability to 1) consult with his lawyer, 2) understand the proceedings against him and the underlying facts with a reasonable degree of rational understanding, or 3) understand the wrongfulness of his acts. Although he had pled not guilty by reason of insanity to one offense seven years earlier, he was convicted of that offense (i.e., he was *not* found not guilty by reason of insanity).

{¶ 28} The record contains evidence from which one might infer that Ferguson has, at some times, exhibited signs of a mental disorder. However, on this record, there is no

---

[1] The PSI's Social History section states that the information it contains was copied from the PSI in Case No. 14-CR-2279, because Ferguson refused to answer any questions in the PSI interview in this case.

basis to conclude that any disorder created a reasonable question as to Ferguson's competency or sanity at the time of these offenses, issues on which Ferguson bore the burden of proof. Specifically, there was no evidence that Ferguson did not understand the nature and objective of the proceedings or was unable to help with his defense. There also was no evidence that he did not understand the wrongfulness of his acts at the time of the offense; his flight from the motel and from sheriff's deputies, as well as the circumstantial evidence that Ferguson took and disposed of the sheets from the motel room, support the inference that he did understand the wrongfulness of his acts. Finally, there is no basis to conclude that additional testing related to Ferguson's mental health would have affected the outcome of this case. As such, we cannot conclude that defense counsel acted ineffectively in failing to pursue this issue, or that the court abused its discretion or committed plain error in not ordering mental health evaluations on its own initiative.

{¶ 29} Ferguson's assignments of error are overruled.

*Merger*

{¶ 30} In its cross-appeal, the State argues that the trial court erred in merging Ferguson's convictions for rape and kidnapping.

{¶ 31} R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of

dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 32}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court of Ohio clarified the applicable standard when determining whether offenses merge as allied offenses of similar import and provided as follows:

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 30-31.

**{¶ 33}** As to the question of import and significance, "two or more offenses of

dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23.

**{¶ 34}** Our review of an allied offenses question is de novo. *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12.

**{¶ 35}** The State argues that Ferguson's movement and restraint of T.D. had significance apart from facilitating the rape, that the harm caused by each offense was separate and identifiable, and that there were intervening acts – such as Ferguson's taking the phone from T.D. and throwing her on the bed – which show separate acts or a separate animus.

**{¶ 36}** We disagree with the State that the kidnapping in this case was committed separately or with a separate animus. T.D. went to the hotel voluntarily and remained there for several hours while she watched television, ate and used drugs; she was not concerned for her safety or held against her will during this initial period. T.D. became afraid only when Ferguson began making sexual comments and talking about others in the room and hearing voices. At this point, she borrowed Ferguson's phone and went to the bathroom to call her mother and ask for a ride. Ferguson then grabbed the phone away from T.D., threw her on the bed, began to undress her, and began various forms of sexual assault. There is no basis to conclude that Ferguson's restraint of T.D. at this point was motivated by something other than the intended sexual assault. Although T.D. was hit in the head as she struggled with Ferguson on the bed, there was no evidence that the injuries to her head or to her arm (from being thrown on the bed) had a separate animus from the rape. The other sex acts which T.D. alleged had occurred between the

time she was pinned to the bed and the time of her vaginal rape (cunnilingus and forced masturbation of Ferguson) formed the basis of other charges (of which Ferguson was acquitted), but did not demonstrate that Ferguson's restraint of T.D. was separate and apart from the rape. The trial court did not err in merging the offenses of kidnapping and rape.

{¶ 37} The cases relied on by the State in support of its argument are distinguishable. In *State v. Dudley*, 2d Dist. Montgomery No. 22931, 2010-Ohio-3240, the defendant pushed the victim over a guard rail and fell on her, injuring her ankle, and then dragged her 50 to 60 feet into the woods, where she was raped. When he left, he told the victim that, if she moved even "an inch" before he came back, he would kill her, and she did remain there for some time. We concluded that, under these circumstances, the defendant's restraint of the victim was done with a separate animus and caused separate harm to the victim from the rape. These facts are not analogous to Ferguson's case.

{¶ 38} We are also unpersuaded that cases cited by the State involving numerous types of rape, with "intervening acts" such as loss of an erection, removal of a tampon, and transition from one position or type of rape to another, which resulted in multiple counts of rape or attempted rape, support a conclusion that the rape and kidnapping in this case were not allied offenses. *See State v. Jones*, 78 Ohio St.3d 12, 676 N.E.2d 80 (1997); *State v. Burgess*, 162 Ohio App.3d 291, 2005-Ohio-3747, 833 N.E.2d 352 (2d Dist.).

{¶ 39} The State's assignment of error on cross-appeal is overruled.

{¶ 40} The judgment of the trial court will be affirmed.

DONOVAN, J., concurs.

WELBAUM, P. J., concurring:

{¶ 41} I concur in both the opinion and judgment of this court, but write separately merely to distinguish *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, a factually similar case involving rape and kidnapping offenses that we held were not allied offenses that merge.

{¶ 42} Like the instant case, in *Portman*, the victim's interaction with the defendant was initially voluntary. The victim in *Portman* was an escort who agreed to meet the defendant at the clothing store where he worked. After the victim in *Portman* arrived at the store and began interacting with the defendant, she, like the victim in this case, became uncomfortable with the defendant's behavior and wanted to leave. After the victim in *Portman* told the defendant that she wanted to leave, the defendant put a gun to her head, berated her, and then raped her several times. *Id.* at ¶ 33-37.

{¶ 43} Unlike *Portman*, the victim in the present case, T.D., never directly told Ferguson that she wanted to leave the motel room before he raped her. Even if we presume that Ferguson overheard T.D. tell her mother over the phone that she wanted to leave, the cases are still distinguishable because, unlike this case, the defendant in *Portman* prolonged the restraint of the victim after he raped her and, in doing so, subjected her to a separate risk of harm unrelated to the rape offense. Specifically, the defendant in *Portman* refused to allow the victim to use the restroom on the main floor of the clothing store, and when the victim attempted to leave against the defendant's wishes, the defendant wrestled with the victim on the stairs to prevent her from leaving. During this struggle, the victim was able to get control of the defendant's gun and escaped by

shooting him in the face.   *Id.* at ¶ 37.

**{¶ 44}** We held in *Portman* that "[a] separate animus for kidnapping exists where (1) 'the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense,' or (2) 'the asportation or restraint of the complainant subjects the complainant to a substantial increase in risk of harm separate and apart from that involved in the underlying crime.' " *Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343 at ¶ 32, quoting *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), syllabus. (Other citation omitted.)   "Although focused on the animus aspect of the allied offense analysis, these factors are also reasonable considerations for determining whether the defendant committed kidnapping as separate conduct from other offenses."   *Id.*, citing *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 13.   (Other citation omitted.)

**{¶ 45}** There is no question that the defendant in *Portman* prolonged the restraint of the victim and also subjected the victim to a separate risk of harm when he wrestled the victim on the stairs while armed.   Accordingly, it was appropriate not to merge the defendant's rape and kidnapping offenses in *Portman* due to there being separate conduct and a separate animus.   In this case, however, T.D. fled the motel room after Ferguson raped her; therefore, Ferguson's restraint of T.D. was not prolonged past the rape and T.D. was not subjected to a risk of harm separate and apart from the rape.   In turn, the present case and *Portman* are factually distinguishable, as the kidnapping in this case was incidental to the rape and the offenses were properly merged at sentencing.

. . . . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Alice B. Peters
Adam J. Arnold
Hon. Timothy N. O'Connell